Brewster, J.
Petitioner has instituted this proceeding pursuant to article 78 of the Civil Practice Act to review an order made by respondents, the Public Service Commission of the State of New York, on October 21.1943, which directs petitioner to write off from its books, records, and accounts, as of December 31, 1940, certain asset accounts in the aggregate amount of~$5,282,544.39 and to charge it to its earned surplus.
A summary of the history of petitioner as to its formation and original acquisition of property, its original capitalization and ownership and the effects upon its capital accounts which resulted by virtue of subsequent legislation, all of which seems relevant to an understanding of the grounds upon which the order in question was made, as well as of petitioner’s opposition thereto, is as follows:
Petitioner, as a body corporate, came into existence on June 11, 1904, by the consolidation of two former corporations — Rochester Light & Power Company and Rochester Gas & Electric Company. This was effected in accordance with chapter 566 of the Laws of 1890, the Transportation Corporations Law, which authorized two or more gas or electric corporations to consolidate into a single entity by complying with the provisions of the Business Corporations Law as regards the consolidation of business corporations. Petitioner was thus organized under the name of Rochester Railway and Light Company — later and in 1919 changed to petitioner’s present name. At the time of the consolidation, Rochester Gas & Electric Company owned practically all of the water rights and most of the other property first acquired by petitioner and its owners received therefor secondary mortgage bonds of the new company, and the owners of the other constituent, Rochester Light & Power Company, received for what it transferred and paid in cash to the new company, only the latter’s issue of its common voting stock. The consolidation agreement which gave rise to petitioner’s formation appraised the total value of all the property, franchises and rights which it thus acquired, at $14,169,167.62, which was the amount it set up as its book cost thereof, and the distribution of its payment may be illustrated as. follows:
*205 (a) To the owners of Rochester Gas & Electric Company
by issuance of bonds............... $5,178,840.00 •'
by liabilities assumed.............. 6,733,399.31
$11,912,239.31
(b) To the owners of Rochester Light &
Power Company
70% of $4,000,009 common stock less $275,000 cash (additional consid-
eration for said stock)........... 2,525,000.00
Total......................... $14,437,239.31
Less assets other than plant and
equipment ...................... 268,071.69
Net cost (in securities and obligations) of plant and investment to petitioner......... $14,169,167.62
After the enactment of the Public Service Commissions Law (L. 1907, ch. 429), and on October 21, 1908, there was duly promulgated a ‘ ‘ Uniform System of Accounts ’ ’. This required public utilities such as petitioner, to set up their books so as to show the actual cost of property used in the public service, and which eventually was to be shown in various subaccounts as therein provided. Thereafter, as time and occasion afforded, the fixed capital of utilities acquired prior to 1908 was analyzed and examined by the Public Service Commission and the actual cost of its properties was distributed to various subaccounts. This treatment of petitioner’s capital account came about in 1918 and 1919. Up to that time its original capitalization had remained in sum total. But as a result of proceedings just referred to, $4,600,000 of its capital was allocated to its water rights, $2,054,653.18 to another prescribed account then known as “ Other Intangible Capital ”, and the remainder to other asset accounts not here material. These allocations were carried into a “ Final Corrected Balance Sheet as of December 31, 1918, Showing Proposed Adjustment of Reported Balances at That Date.” On July 29, 1919, the Public Service Commission made an order directing entries to be made accordingly, and with which petitioner complied. From that date until the order in question the aforesaid setups and entries as to petitioner’s capital accounts remained unquestioned on *206 petitioner’s books, during which time the commission conducted various examinations of its accounts and records; financial statements were made and circulated, and securities sold with the commission’s approval, with the one exception that in 1938, in connection with the pendency of a rate case, petitioner and the Public Service Commission appear to have arranged in its settlement that the aforesaid item in petitioner’s capital account assigned to “ Other Intangible Capital ” was to be written off at the annual rate of $200,000, and which arrangement has been carried out so that as of December 31, 1944, the original amount had been reduced to $650,373.18, and, as of the date of entries directed by the order under review, December 31, 1940, it had been reduced to $1,450,373.18. In 1937, the commission promulgated a new “ Uniform System of Accounts ” effective January 1, 1938. Among other things this system provided, as to the cost of properties of electric utilities, that an asset account known as “Account 101 — Electric Plant in Service ”, should show only the “ original cost ” thereof, which was defined as being the cost of the property to whatever owner had first devoted it to the public service; and that in another account known as “ Account 105 — Electric Plant Acquisition' Adjustments ” there should be entered the difference, if any, between such “ original cost ” and its cost to the accounting owner. Prior to this and on October 20, 1936, the commission had issued an order in case No. 8970 commonly known and referred to as the “ Continuing Property Records ” order. This required public utilities to make and keep continuing property records of all their property so as to show the “ original cost ” thereof. After the effective date of said orders of 1936 and 1937, petitioner engaged itself in compliance with them.
The order before us was made in the course of a proceeding which respondents instituted on their own motion on June 30, 1938, as case No. 9552, under a two-fold power (a) to investigate and correct entries on-petitioner’s boobs and records, and (b) to determine the original cost of its property. (Public Service Law, § 66, subd. 9; § 114.) The hearings held therein early shaped and continued themselves so that the investigation was directed pretty much wholly to the ascertainment of the aggregate “ original cost ” of petitioner’s water rights in and to the Genesee River, viz. s the cost to the former owners of them who had first employed them in the public service. The proceeding took such a course that the commission separated the hearings as to this matter from the overall *207 reclassification of petitioner’s properties and confined the issue to that subject of such “ original cost.”
While as aforestated the petitioner has owned these water rights since June 11,1904, the ascertainment of their “ original cost ” carried the inquiry back over many years and as far as the year 1885 when, in that and the following year, some of petitioner’s predecessors had purchased such of them as embraced rights to over one half of the potential water power to which all of the rights in question relate. In the proceeding such original cost of petitioner’s water rights was found to be $632,132.21, exclusive of an item of $135,696.58 which is not in dispute and was the cost of petitioner’s acquisition of a certain minor part of its water rights after its formation.
The order in question, made in the course of the proceeding lastly referred to, but not in culmination thereof, for it still continues, was made upon the ground that, with the exception just noted, such ascertained “ original cost ” called for a write-off in its capital accounts, the computation of which is illustrated as follows:
Petitioner’s book cost of water rights acquired in 1904 ................................... $4,464,303.42
Petitioner’s book cost of water rights acquired subsequent to 1904 ........................ 135,696.58
Petitioner’s book cost of intangible capital acquired in 1904 ...........,............... 2,054,653.18
Total................................... $6,654,653.18
Less amounts amortized in connection with rate case settlement ........................... 604,280.00
Balance of cost on petitioner’s books December 31, 1940 .................................. $6,050,373.18
Less determined “ Original Cost ” of water rights ordered to be placed in account
Mo. 101, viz.:.............. $632,132.21
' 135,696.58 $767,828.79
Ordered charged to surplus............... $5,282,544.39
It is the petitioner’s claim that something over $3,000,000, should have been retained in account Mo. 101 as representing the true “ original cost ” of the water rights, and that the balance of their actual cost to petitioner should be retained in account Mo. 105.
*208 For aught that appears in the record before us petitioner’s formation and original acquisition of its properties were all brought about in a lawful manner, and upon its culmination the erstwhile companies which had agreed to the consolidation ceased to exist. (Electric Bond & Share Co. v. State of New York, 249 App. Div. 371.) Likewise the evidence is that when the consolidation was effected neither of the constituent companies were in any wise affiliated, nor did they have any interlocking directorship or common ownership. There is no evidence that prior to the agreement of consolidation either of the constituent companies had padded their accounts or written up their assets for the purpose of inflating the capitalization of the new company. The evidence is undisputed that upon the latter’s formation the owners of the larger constituent parted all company with any stock holding ownership therein, but took in exchange for what it had contributed, a series of mortgage bonds upon the entire property and assets of the new concern, secondary however to its erstwhile issuance of bonds and its other indebtedness, all of which were assumed by the new company. The owners of the other constituent, in consideration of what it gave into the consolidation, received the entire stock ownership, and in addition to the properties, rights, and franchises which it made over to the new company, its owners also contributed $275,000 in cash and subjected themselves to a further cash assessment on its stock of some $1,200,000 which was subsequently paid, all of which* of course, went to the security of the bonds received by the owners of the Rochester Gas & Electric Company. To uphold the order in question respondents argue that the price which petitioner thus paid for the property it so acquired, and as reflected in its capitalization, did not stem from arm’s length bargaining but was akin to the capitalization of intercorporate profits or other collusive dealings whereby unreal, untrue, and fictitious values went into an inflated capital structure. But respondent conducted no hearing and considered no proofs as to this, other than the fact of the method whereby the petitioner acquired its property in 1904, and, as to the water .rights, capitalized them at a price paid for them which was far in excess of what it found had been the aggregate of their “ original cost.” Whether in fact the price paid and capitalized was in line with fair and sound values was neither further considered nor explored. The very method of acquisition and resultant capitalization seems to have been the ground for its condemnation. The respondents’ reaction t© such -methods -appear to .Jhav.e ¡been tHat “JNb j^ood *209 thing could come from Nazareth ” — i.e., a consolidation. Such may arise from a zeal for the protection of the public interest occasioned by the increase in governmental control which began in 1907. Ways and means of public utility financing and accounting, current and lawful prior to that year, when compared to what is now required, may, by the very methods formerly sanctioned presently appear in some quarters to cast over them a cloud of unwholesomeness as regards the public interest. But we must keep in mind that the protection or furtherance of the public interest has its constitutional limitations. (Matter of New York Edison Co. v. Maltbie, 244 App. Div. 685, affd. 271 N. Y. 103; People ex rel. Iroquois Gas Corp. v. Public Service Commission, 264 N. Y. 17.) When in .1933 the commission defined and prescribed accounting methods relating to the concept of “ original cost ” it then required that ■any advance thereof in purchase price was to be cast into a “ Suspense to be Amortized ” account, and there made subject to be written off from capital as the commission might later prescribe. Such was held to be unauthorized and confiscatory. (Matter of New York Edison Co., supra.) In the instant case the write-off is more direct and pointed in confiscation if in fact the water rights in 1904 had sound values over and above their determined aggregate “ original cost.”
A unique feature of the water rights which existed when petitioner acquired them some forty-two years ago points a somewhat novel question as regards the application of the doctrine of their “ original cost.” This consists in the fact that when petitioner acquired them they had to some extent been used in the public service, and their prior ownership extended to all and everything which had been or in the future might he accomplished in their exercise and enjoyment, yet, prior to 1904, the early owners of those rights, quite considerable in number and ownership, had only partially or incompletely utilized them in the public service. This is shown by evidence that when petitioner acquired them their exercise was only to the extent of their firm power and a. 18,475 horsepower development, whereas petitioner was successful in harnessing them to the extent of 54,506 horsepower and employed their secondary powers. It is respondents’ view and determination that notwithstanding this, these water rights may now go into petitioner’s capital account only at the figure of their cost to the first owners who to any extent used them in the public service, even though such cost is related back to the time of the early beginnings of the development of the generation of hydroelectrical energy and *210 its transmission and distribution in the business of public service. In this respondents rely upon the evidence that the' use made of such rights prior to 1904, was at times as full and extensive as was possible with the then artificial means employed and the quantity of falling water permitted. That is, in times of extreme low water, the means installed utilized all the water there -was. So, they claim, such use stamped the original cost to the early owners as being the full amount which may now go into petitioner’s capital structure on - account of them. No valuation of the water rights, as such may have existed when petitioner acquired them, has been made. In fact, it has been ruled out, and the price which in effect petitioner paid for them over their original cost has been stricken from its capital accounts because the method of acquisition was by the consolidation aforesaid.
It may not be gainsaid that when petitioner acquired its water rights, they included attributes which were separable in the concept of property, and as such had never been devoted to the public service, viz.: the rights to the use of the water of the river in various stages of greater flow and volume. These constituted property which was separable and alienable as regards that which had been devoted- to the public service. They were not coefficients of what had been so devoted and so, separately considered, they had values which may have been capable of due appraisal. At least we may not say here and now to the contrary. We may not even say such values did not exist independent of a consideration of their use in the public service. But in this review we are not concerned with what rules and techniques are applicable to the problem of valuation. Bather, the fundamental question is whether, that problem must be solved before a write-off from capital is authorized.
Respondents’ thesis which culminated in the order under review thus ignores the following matters: (1) any value which was inherent in the water rights acquired as regards their parts or elements which had never been employed in the public service prior to petitioner’s acquisition, (2) any increment of value which pertained to them by virtue of a single ownership and control. The value of all of the rights in question in one ownership, it may be, exceeded the aggregate, value of their separate parts in multiple ownerships, (3) the advance over their original cost which petitioner paid for them in 1904. While this amount was not originally separately stated — such not being then required — still it was necessarily included in the *211 appraisal made by the consolidation agreement for the purpose of the new company’s capitalization. And this was done pursuant to then existing law. (Business Corporations Law, L. 1890, ch. 567, § 14, renumbered § 8 by L. 1892, ch. 691, amd. L. 1901, ch. 520.) And, the amount was later ascertained and allocated by the commission’s direction in 1919. (4) Also ignored is the fact that under the evidence presented the situation and relations of the companies which consolidated was such as in the nature of things to have called for arm’s length bargaining to hold down the determined capitalization, because, as aforestated, the owners of one company received only mortgage bonds and the owners of the other all the common stock issued which represented only the resultant equity in the properties so transferred. Respondents’ argument that there was collusion is without supporting evidence.
It is my opinion that because of the avoidance of these matters the order under review may not be upheld: Even though it should eventually be decided that the early and incomplete devotion of the water rights to the public service stamps their “ original cost ” as the only amount at which they may be carried in present account No. 101, still when petitioner acquired them such ascertainable values as were inherent in their unutilized and undeveloped potentialities and in their amalgamation in single ownership were factors legitimately employable in any bona fide, arm’s length, fair bargaining as between seller and buyer, and clearly any fair price paid because of the working of such factors would be an item of cost lawfully cast into account No. 105 under the existing system.
I cannot subscribe to the proposition that the mere fact that petitioner acquired this property as a result of the consolidation is any evidence, much less conclusive evidence, that fair bargaining did not take place or that values were not properly measured in terms of price and legitimately capitalized. In the adjudications in the cases upon which respondents rely as authority for striking down the instant capitalization there were instances of merger or consolidation wherein the evidence disclosed inflationary practices as to which the record before us is barren of evidence.
As to the part of the order which directs the write-off of the remainder of the account pertaining to intangible capital, for the reasons aforestated, viz.: failure of hearing and consideration of evidence as to values, it should also fall. Moreover, the order’s direction to accelerate the 1938 arrangement for the amortization of that account has no evidence to support it.
*212 The order under review should be vacated, and annulled, and since the proceeding pends wherein it was made, there is no occasion to remit but the annulment should be without prejudice to a continuance of such further proceedings under respondents ’ order of June 30, 1938, as are not inconsistent with this opinion.